# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**C.K., a minor, by and through his parent, S.R.,**          CASE NO. 3:19 CV 2753

Plaintiff,

v.                                                           JUDGE JAMES R. KNEPP II

**BOARD OF EDUCATION OF
SYLVANIA CITY SCHOOL DISTRICT,**

Defendant.                                                   **MEMORANDUM OPINION AND
ORDER**

## INTRODUCTION

Currently pending before the Court are cross-motions for judgment brought by C.K. (through his parent, S.R.) and the Board of Education of Sylvania City School District ("the District"). Each party in this case has brought a claim against the other in distinct proceedings under the Individuals with Disabilities Education Act ("IDEA" or "the Act"). C.K. brought the first case, chronologically, in November 2019, seeking attorney's fees after prevailing in his state-level administrative hearing. (Doc. 1). After an unsuccessful attempt at settling that dispute, *see* Doc. 6, the District filed its own lawsuit to overturn the administrative decision. *See Bd. of Educ. of Sylvania City Sch. Dist. v. C.K.*, No. 20-cv-81 (N.D. Ohio) (Doc. 1). That case was then consolidated with C.K's case. (Doc. 9). The parties then brought the currently-pending cross-motions for judgment. *See* Docs. 26, 38.

Jurisdiction is proper under 20 U.S.C. § 1415(i)(3)(a) ("The district courts of the United States shall have jurisdiction of actions brought under this section without regard to the amount in controversy."). *See also* 28 U.S.C. § 1331. For the reasons discussed below, the Court grants the

District's motion, denies C.K.'s motion, and finds the District did not violate C.K.'s rights under the Act.

## BACKGROUND

C.K. was diagnosed with autism before age two. (Tr. Vol. 1, at 44)[1]. He immediately began receiving intensive programming from various sources aimed at addressing his autism. *Id.* at 44-45.

In kindergarten at Capable Kids, C.K. suffered from significant reading deficits, including an inability to learn letters and their sounds. *Id.* at 45. His early reading test scores showed he was in the below average range, specifically struggling with matching letters and sounds that were consonant diagraphs, producing rhyming words, and blending sounds. (Doc. 30, at 16). Before first grade, S.R. hired Tammy Alexander, a certified reading specialist who used Orton-Gillingham methods, to work with C.K. over the summer and during the school year. (Tr. Vol. 1, at 46). C.K. attended first grade at Hope Learning Academy, where his individualized education program (IEP) called for individual or small group reading intervention with a specialist 30 minutes per day, five days a week. (Doc. 30, at 35). Ms. Alexander continued to work with C.K. between first and second grades, up to and through the beginning of C.K.'s second grade year. (Tr. Vol. 1, at 46).

C.K. enrolled in second grade at a Sylvania City School District elementary school in the fall of 2015. *Id.* at 47. C.K.'s December 2015 evaluation team report included that, in March 2015, C.K. scored poorly in all areas of phonemic awareness, phonological awareness, rapid symbol naming, letter and word identification, word attack skills, passage comprehension, and listening comprehension. (Doc. 30, at 50). When tested by Ms. Alexander in October 2015, C.K. showed a

---

1. The December 2018 administrative hearing transcript in this case consists of three volumes located at Docs. 34 (Vol. 1), 35 (Vol. 2), and 36 (Vol. 3). For simplicity, the Court herein cites the transcript pages, rather than the ECF pages.

2

nearly two-grade level deficit in reading skills upon the start of his time at a District elementary school. (Doc. 28, at 146); (Tr. Vol. 1, at 56-57).

S.R.'s stated goal was for C.K. to catch up to grade level before he began third grade. (Doc. 30, at 130). The District IEP, formulated in December 2015 and agreed to by S.R., identified four goals for which C.K. would receive intervention services: reading decoding, social communication, writing, and executive functioning. *Id.* at 110-18. To make progress on this reading goal, the District provided C.K. 100 weekly minutes of services. *Id.* at 119. This was less reading time than he received at Hope Academy, which provided him with 30 intervention minutes daily, *id.* at 35, though the District's IEP listed more goals than Hope Academy's IEP, *compare* Doc. 30, at 35, *with* Doc. 30, at 119-21.

While C.K. was in second grade, S.R. hired two different District elementary teachers to provide additional intervention for C.K. for approximately two-to-four hours per week. (Tr. Vol. 1, at 49). Nonetheless, S.R. testified C.K. had still not mastered kindergarten-level reading skills by early spring 2016. *Id.* at 50. Testing showed C.K. remained at a pre-primer reading level, despite an average IQ. (Doc. 30, at 129).

Lindamood Bell (LMB) evaluated C.K. on March 9, 2016. (Doc. 28, at 105). Testing showed C.K. remained at a kindergarten level, or below the first percentile, in reading and decoding abilities. *Id*. LMB recommended four hours of instruction, five days per week, for twelve to fifteen weeks. (Tr. Vol. 1, at 57). LMB made no promises of expected progress at that time. *Id.* at 58. As a result of this intensive tutoring, C.K. missed the first half of each school day, which concerned the District. (Doc. 30, at 129-30). The District noted C.K. needed an escort to and from classes at the beginning of the year but could independently navigate by mid-school year. (Tr. Vol. 2, at 208). He also made progress in reading while working with District staff. *Id.* at 190-91.

3

After C.K.'s second-grade school year ended, he continued receiving the same amount of intensive tutoring from LMB over the summer. (Tr. Vol. 1, at 58-59). LMB testing, conducted on August 11, 2016, showed C.K. improved but was not at grade level at the end of this summer intervention. (Doc. 28, at 106).

Going into C.K.'s third-grade year, LMB recommended maintaining the same level of intervention, but S.R. decided to do one hour before school, and four hours every Saturday for the first half of the school year, instead of the recommended four hours a day, five days a week. (Tr. Vol. 1, at 60). The District provided 100 minutes of weekly instruction in reading decoding. (Doc. 42, at 15). District testing at the beginning of C.K.'s third-grade year showed his reading skills were below grade level. *Id.* at 6. But by February of 2017, more than halfway through C.K.'s third-grade year, LMB testing showed C.K.'s decoding skills were above grade level, and his oral reading skills were at grade level. (Doc. 28, at 105). By the end of third grade, C.K. was reading at a third-grade level, based on his Ohio AIR assessment, a substantial improvement from his fall reading assessment. (Doc. 30, at 188).

At the end of the third-grade school year, the District determined C.K. was not eligible for extended school year (ESY). (Doc. 30, at 157). S.R. enrolled C.K. in an LMB summer program, which focused on reading comprehension instead of reading decoding; testing after the summer program showed a decline in C.K.'s phonics skills, though he remained near grade level. (Tr. Vol. 1, at 62; Tr. Vol. 3, at 132-33).

At the start of fourth grade, S.R. decided to discontinue LMB tutoring to prevent and cure any burnout C.K. felt. (Tr. Vol. 1, at 63-64). S.R. was complimentary of the services the District provided to C.K. (Doc. 29, at 34). In an October 2017 meeting, District employees told S.R. C.K. was progressing well. (Doc. 30, at 184). In November 2017, District employees noted C.K. had

mastered his goals from his previous IEP. (Tr. Vol. 3, at 78-79). New goals were developed in a November 2017 IEP meeting. *Id.* S.R wanted C.K to be fully caught up with his peers by the beginning of sixth grade. (Doc. 30, at 188). One of C.K.'s IEP goals was to apply phonics and word analysis skills to decode words at grade level by the end of his IEP cycle. *Id.* at 191.

In January 2018, during C.K.'s fourth-grade school year, S.R. hired Jeanna Heuring to tutor C.K. in reading decoding and phonics. (Tr. Vol. 3, at 240). Those sessions lasted approximately two or two-and-a-half hours, two or three times per week. *Id.*

In March 2018, S.R. sought ESY services. *Id.* District staff said they would consider ESY, and also noted C.K. was doing well and growing, both academically and socially. (Doc. 30, at 210-11). S.R. testified that, at this March 2018 meeting, she learned C.K. was regressing. (Tr. Vol. 1, at 68). LMB testing from the same time showed C.K. regressed in his fourth-grade year. (Doc. 28, at 324). His English language arts state testing showed C.K. was in the limited scoring range, the lowest of five ranges. *Id.* at 136.

In May 2018, the District formally decided C.K. was not eligible for ESY. (Doc. 30, at 216). S.R. did not work with C.K. on his reading skills over the preceding spring break to try to prevent regression. (Tr. Vol. 1, at 153); (Tr. Vol. 3, at 20-21). The District found its data showed C.K. maintained progress after breaks, and so he was not eligible for ESY. (Doc. 30, at 216). That data included C.K.'s STAR assessment in 2018, which showed improvement in his post-spring break assessment from his pre-spring break assessment, despite S.R.'s claim that she would not read with C.K. over that spring break. *Id.* at 217. His DRA test scores also improved throughout the year. *Id.* at 217-18. Ultimately, S.R. re-enrolled C.K. in LMB tutoring for the summer between fourth and fifth grades. (Tr. Vol. 1, at 72-73). LMB restarted C.K. on the same program as the prior summer. *Compare* Doc. 28, at 330-31, *with* Doc. 28, at 332-33.

During C.K.'s fifth grade year, he received two hours of reading intervention from LMB every school day, which was less than LMB's recommendation but still cut into the school day. (Tr. Vol. 1, at 76-77). This resulted in C.K. missing math instruction. (Doc. 30, at 226). Testimony from Sarah Ellis, an LMB employee, indicated C.K. was reading at grade level in December 2018, still within C.K.'s fifth grade year. *Id.* at 225.

**IHO Opinion**

S.R. filed a due process complaint on May 22, 2018, alleging the district failed to provide C.K. with a free appropriate public education for a variety of reasons. (Doc. 27, at 1-3). This complaint led to a hearing on December 20, 2018, before an impartial hearing officer (IHO), at which time S.R. and C.K.'s counsel narrowed the issues raised to two: seeking reimbursement for LMB tutoring, and C.K.'s attendance record. (Tr. Vol. 1, at 4); *see also* IHO Opinion, at 4[2].

Following the hearing, the IHO issued a written decision on February 14, 2019. (IHO Opinion, at 25). The IHO found the 2017-18 IEP (in place at the time of the hearing) was the stay-put program. *Id.* That IEP provided special education goals for C.K. in five areas: reading decoding, written expression, executive functioning, social communication, and self-regulation. *Id.* at 16.

The IHO found placing C.K. in LMB tutoring removed him from four of the five areas of special education found in his 2017-18 IEP, leaving him focused solely on reading decoding. *Id.* at 18. He found insufficient evidence to support LMB tutoring as necessary to make progress toward C.K.'s IEP reading goal, and noted neither the optimal level of services nor every program requested by parents are required to provide the free appropriate public education to which the Act

---

2. The IHO Opinion is located at Doc. 1-3 in the companion case, *Bd. of Educ. of Sylvania City Sch. Dist. v. C.K.*, No. 20-cv-81 (N.D. Ohio).

entitles C.K. *Id.* Dr. Mark Bowers, who recommended LMB, never observed C.K. during the LMB tutoring. *Id.* The IHO also found LMB tutoring violative of the least restrictive environment (LRE) rule. *Id.* at 22. Because the IHO found the IEP satisfied the free appropriate public education requirement, he denied C.K. and S.R.'s request for reimbursement. *Id.*

Additionally, the IHO found insufficient evidence of regression for C.K. to qualify for ESY services. *Id.* at 23. Because he found no right to reimbursement, the IHO found any statute of limitations questions moot. *Id.*

The IHO also found the District's accounting for C.K.'s tutoring time as unexcused absence was not retaliatory action taken for filing a due process complaint. *Id.* at 24. He cited a change in the law, and evidence that the attendance issue began prior to the due process complaint being filed, supported his conclusion. *Id.* Further, the IHO found notifying the parents of an attendance issue was not an adverse action. *Id.*

The IHO ultimately concluded the 2017-18 IEP provided C.K. with a free appropriate public education and denied the complaint. *Id.* at 17, 24.

**SLRO Opinion**

S.R. appealed the IHO's unfavorable decision in March 2019. (Doc. 27, at 83-84). A State Level Review Officer (SLRO) reviews the IHO's decision. The SLRO, Theresa L. Hagen, reversed each finding made by the IHO, finding the District did not meet its substantive burdens under the Act, and that the District retaliated against C.K. for filing a due process complaint by marking his LMB tutoring absences as unexcused. (SLRO Opinion, at 1-2)[3]. She found the IHO erred in finding the District properly considered the evaluations and assessments of C.K. available to it. *Id.* at 2.

---

3. The SLRO Opinion is located at Doc. 1-4 in the companion case, *Bd. of Educ. of Sylvania City Sch. Dist. v. C.K.*, No. 20-cv-81 (N.D. Ohio).

Further, she found the IHO erred in concluding the District was not required to provide additional reading services to meet its substantive obligation of providing a free appropriate public education. *Id.* The SLRO concluded that "any reading progress" made by C.K. was "wholly as a result of extensive private LMB tutoring". *Id.* at 2-3. Her conclusions rested on whether the District's services would have permitted C.K. to read at grade level. *Id.* at 3. Finding that those services alone would have been insufficient, she concluded the District therefore must reimburse S.R. for the LMB tutoring. *Id.* at 3-6. Additionally, she found the District did not mark C.K. as absent when attending tutoring in second grade, but did so for the same tutoring in fourth grade; on this basis, she concluded the District thus retaliated against C.K. for his mother's assertion of her due process rights. *Id.* at 7-8.

To remedy the District's errors, the SLRO ordered the District to reimburse S.R. for all tutoring expenses for grades two through five, including summer tutoring, and any tutoring paid for during the pendency of this litigation. *Id.* at 9. She also ordered the District to provide any services necessary to remediate C.K.'s reading to grade level, along with any other deficits as a result of C.K.'s unremediated reading deficiencies. *Id.* She found the District had failed to provide adequate reading services in the past, and therefore specifically ordered it to provide LMB tutoring until LMB testing shows C.K. no longer requires remedial education services. *Id.* at 9-10. She also ordered the District to alter C.K.'s educational record to show any absences to attend LMB tutoring were excused. *Id.* at 11.

In addressing S.R.'s first issue on appeal – that the District failed to provide C.K. with a free appropriate public education – the SLRO relied on inaccurate statements of the law. *See id.* at 38. She accused the IHO of failing to rely on the Supreme Court's most recent on-point case, though she herself repeatedly cited the Supreme Court as the source of language it did not write.

*Id.* She concluded the District failed to meet its procedural obligations under the Act by failing to consider evaluations from Dr. Bowers. *Id.* at 42-44. She concluded it was not unreasonable for S.R. to expect C.K.'s disability could be entirely "overcome", and that the District should have sought this goal itself. *Id.* at 45. She attacked the District's failure to follow a particular education system properly, finding it not appropriately ambitious in light of C.K.'s intelligence. *Id.* at 48-50.

Next, the SLRO considered whether the LMB tutoring was essential to C.K.'s reading progress. *Id.* at 52-66. She found it was, based on C.K.'s educational records and seemingly independent research into the best educational methods for reading instruction. *Id.*

The SLRO also found C.K. was entitled to ESY services. *Id.* at 66-79. Relying on Fourth Circuit caselaw, the SLRO found the District's refusal to provide ESY came at the cost of closing C.K.'s window of opportunity, and thus he was entitled to compensation for past summer tutoring. *Id* at 70-71 (citing *JH ex rel. JD v. Henrico Cty. Sch. Bd.*, 326 F.3d 560, 569 (4th Cir. 2003)). She also found the District's treatment of C.K.'s absences retaliatory. *Id.* at 79-86. Finally, she required the District to provide reimbursement for past tutoring services. *Id.* at 87-94.

## STANDARD OF REVIEW

Any party receiving an unfavorable decision in the administrative process proscribed by the Act can bring suit in a district court. 20 U.S.C. § 1415 (i)(2)(a). When deciding a case brought under 20 U.S.C. § 1415, the court reviews the records of the administrative proceedings below, 20 U.S.C. § 1415(i)(2)(c)(i), and bases its decision on the preponderance of the evidence, granting relief deemed appropriate 20 U.S.C. § 1415(i)(2)(c)(iii). Thus, while the motions seek summary judgment in name, the Court does not apply the typical summary judgment standard.

The Act is an effort from Congress to promote the education of children with disabilities, who were, prior to the Act, either "totally excluded" or "sitting idly in class awaiting the time when

they were old enough to drop out." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 179 (1982) (internal quotation omitted). It imposes both procedural and substantive requirements to ensure all children with disabilities receive a free appropriate public education. *Id.* at 181-83. The Court performs two inquiries in suits brought under IDEA: first, whether the State has complied with procedures set out by the Act, *Id.* at 206, and, second, whether the IEP developed through the Act's procedures is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances" *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001 (2017). The Supreme Court expressly declined to explain what "appropriate progress" means, instead instructing lower courts to expect school authorities to have offered a "cogent and responsive" explanation for why a particular IEP enables appropriate progress. *Endrew F.* at 1001-02.

This somewhat unusual standard of review has been described as "modified *de novo*" review. *Burilovich v. Bd. of Educ. of Lincoln Consol. Sch.*, 208 F.3d 560, 565 (6th Cir. 2000). Procedural matters, which by their nature do not require educational expertise, are reviewed for strict compliance with IDEA requirements, though technical deviations will not invalidate an IEP. *Dong v. Bd. of Educ. of Rochester Cmty. Schs.*, 197 F.3d 793, 800 (6th Cir. 1999). If the IEP was developed through proper procedure, the court grants greater deference to the district's determinations on the IEP's substantive compliance with the *Endrew F.* standard—that is, whether the IEP is "reasonably calculated to enable a child to make progress appropriate in light of the circumstances". *Id.*; *Endrew F.*, 137 S. Ct. at 1001.

To the extent the Court defers to the state administrative officers, the court's deference is due to the decision of the SLRO, regardless of any disagreement between the IHO and the SLRO. *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 624 (6th Cir. 1990) (superseded by regulation

on other grounds). But this deference varies in weight: the court will not second-guess credibility determinations made by the IHO, *see B.H. v. W. Clermont Bd. of Educ.*, 788 F. Supp. 2d 682, 693 (S.D. Ohio 2011), and will not defer when the SLRO's educational expertise is not relevant to the findings, *Kings Local Sch. Dist., Bd. of Educ. v. Zelazny*, 325 F.3d 724, 728 (6th Cir. 2003). Further, an SLRO's decision must be reasonable to receive deference. *Burilovich*, 208 F.3d at 567 ("A court should defer to the administrative findings only when educational expertise is relevant to those findings *and* the decision is reasonable.") (emphasis added).

Each party to this case bears the burden of proof on different aspects of the case. The party seeking relief bears the burden of persuasion. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57–58 (2005). Thus, the District must show it is entitled to relief from the SLRO's opinion. C.K., however, carries the burden of proving the IEP itself inappropriate. *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 768 (6th Cir. 2001) ("The party challenging the terms of an IEP bears the burden of proving that it is inappropriate.").

## DISCUSSION

The District, in seeking to overturn the SLRO's decision, argues her opinion misstates the law and the facts and must, therefore, be overturned and replaced by the IHO's opinion. (Doc. 26-1, at 16-26, 30). C.K. argues the District's IEP fails to provide him with a free appropriate public education, and the SLRO's opinion properly applied the law to an accurate assessment of the facts. (Doc. 38, at 14-32). Additionally, C.K. argues the District waived the right to contest the SLRO's decision that it retaliated against C.K. by recording his tutoring absences as unexcused. *Id.* at 39 n. 9. The District, in its reply brief, argues it reserved the right to address that issue, and that the absences were recorded in compliance with state law. (Doc. 39, at 18-19). For the following reasons, the Court finds the District meets its burden to overturn the SLRO's decision, C.K. did

not meet his burden of showing the District's IEP failed to provide him a free appropriate public education, and the District waived its right to contest the SLRO's conclusion that the District retaliated against C.K. Therefore, C.K. is not entitled to reimbursement for LMB tutoring, but the District must amend C.K.'s attendance record in compliance with the SLRO's order.

Reimbursement

C.K.'s primary claim is for reimbursement from the District to compensate him for the LMB tutoring he has received for several school years and summer breaks. (Doc. 38, at 39); *see also* Tr. Vol. 1, at 4. Parents are entitled to reimbursement when the public school placement violates the Act, and the placement chosen by the parent is proper under the Act. *Knable*, 238 F.3d at 763. Thus, the first and ultimately dispositive question is whether the District's placement for C.K. violates the Act. *Id.* The Act contemplates both procedural and substantive violations could deprive a student of a free appropriate public education, and thus this Court will assess both aspects of the District's decision making below.

*Procedural Compliance*

The Court is responsible for reviewing the District's strict procedural compliance with the Act. *Babb v. Knox Cty. Sch. Sys.*, 965 F.2d 104, 107 (6th Cir. 1992) (citing *Rowley*, 458 U.S. at 205). C.K., in his briefing, does not raise any procedural attacks on the District's IEP. However, because the SLRO found the District failed to comply with the procedural requirements of the Act by not considering private evaluations conducted by Dr. Bowers, this Court will review the District's procedural compliance. (SLRO Opinion, at 42-44). Specifically, she pointed to two reports from Dr. Bowers, one from February 2016 (Doc. 28, at 34-47), and another in July 2018 (Doc. 28, at 56-71) that she contended the District should have considered but did not. But the District considered Dr. Bowers's 2018 report and incorporated it into C.K.'s IEP. (Doc. 30, at

304). And S.R. did not share the 2016 report with the District. *See id.* at 129-30. The District is only obligated to consider private evaluations it possesses. 34 C.F.R. § 300.502(c) ("If the parent obtains an independent educational evaluation at public expense or *shares with the public agency an evaluation obtained at private expense* …") (emphasis added). Thus, the SLRO's finding regarding this procedural defect is without merit, and this Court finds no procedural defect affected C.K.'s substantive rights.

*Substantive Compliance*

This Court is tasked with assessing whether C.K. received the free appropriate public education the Act guarantees him. *L.H. v. Hamilton Cty. Dep't of Educ.*, 900 F.3d 779, 788 (6th Cir. 2018) (citing 20 U.S.C. § 1412(a)(1)(A); *Endrew F.*, 137 S. Ct. at 993). There are two components to this analysis—did the district provide an appropriate IEP for the disabled student, and does that program provide a free appropriate public education in the least restrictive environment. *L.H.*, 900 F.3d at 788. C.K. bears the burden of showing the District did not satisfy its obligations. *Dong*, 197 F.3d at 799 ("[T]he party challenging the terms of an IEP should bear the burden of proving that the placement was not appropriate.").

*Deference*

The first question – is the IEP appropriate – requires educational expertise, which this Court generally finds by deferring to the available educational expertise, namely the district officials and state-level adjudicatory officers. *Endrew F.*, 137 S. Ct. at 1002 ("A reviewing court may fairly expect those authorities to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances."). Here, both the SLRO and the District are generally entitled to deference, though for different reasons. Because the District complied with the procedural

13

requirements in developing C.K.'s IEP, its substantive decisions regarding that IEP are entitled to deference. *Dong*, 197 F.3d at 800.[4] However, the SLRO is expected to possess both educational and legal expertise to assess an IEP's compliance with the substantive requirements of the Act. *Deal*, 392 F.3d at 865; Ohio Admin. Code § 3301-51-05(K)(10)(c)(i) ("[A]t a minimum, a hearing officer: . . . (b) Must possess knowledge of, and the ability to understand, the provisions of the IDEA, federal and state regulations pertaining to the IDEA, and legal interpretations of the IDEA by federal and state courts."). In the present case – as discussed in greater detail below – the SLRO does not display the requisite expertise, and the Court thus concludes her opinions are not entitled to any deference.

The SLRO's ultimate conclusion requires the District to violate Supreme Court precedent, and thus must be set aside. The SLRO ordered the District to, *inter alia*, provide prospective relief to "fully and expeditiously remediate C.K.'s ongoing two-year reading deficit to close the gap and enable him to appropriately participate in grade level education." (SLRO Opinion, at 100). But recent decisions make clear the Act does not and cannot promise specific educational outcomes for any child. *A.A. v. Northside Independent School District*, 951 F.3d 678 (5th Cir. 2020) (The

---

4. *Dong*, a published Sixth Circuit case from 1999, held that districts that comply with the procedural requirements of the Act are entitled to deference in their substantive decision. 197 F.3d at 800 ("If the procedural requirements of the IDEA are met, greater deference is to be afforded to the *district's* placement decision.") (emphasis added). This language was repeatedly quoted in subsequent Sixth Circuit cases. *See, e.g.*, *Burilovich*, 208 F.3d at 566; *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 854 (6th Cir. 2004); *Nack ex rel. Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 610 (6th Cir. 2006). Then, in 2018, *Dong* was again cited by the Sixth Circuit, but for a different proposition: that the district's procedural compliance required the court to defer to the administrative officer's findings of fact. *See L.H.*, 900 F.3d at 790 ("If the procedural requirements are satisfied, the court grants greater deference to the *State ALJ's* determinations on the second step, the substantive analysis.") (citing *Dong*, 197 F.3d at 800) (emphasis added). The court offered no explanation for this variation, and thus the Court will follow *Dong*'s instructions to defer to the District's substantive assessment when the District's procedure complies with the statute. This is because the Court does not understand how a district's procedural compliance entitles the hearing officers to deference, as they do not develop the IEP itself.

14

IDEA also "cannot and does not promise 'any particular [educational] outcome.'" (quoting *Endrew F.*, 137 S. Ct. at 998, *Rowley*, 458 U.S. at 192). Thus, this Court cannot enforce this order upon the District.

Generally, when the IHO and SLRO disagree, this Court is bound to defer to the SLRO, who has the final administrative word on the issues. *Burilovich*, 208 F.3d at 567. However, this case presents an SLRO opinion that, for the reasons described herein, cannot be relied upon and deserves no deference. In such a case, district courts have relied upon the expertise of the lower-level state reviewer, the IHO. *See Bd. of Educ. of the Toledo City Sch. Dist. v. Horen*, 2010 WL 3522373, at *15, n.11 (N.D. Ohio). The IHO found C.K.'s 2017-18 IEP met the *Endrew F.* standard, in part because test scores showed C.K. made progress. (IHO Opinion, at 21). He relied particularly heavily on progress made by C.K. during his fourth-grade year, when he did not attend LMB tutoring, and on the opinion of District employee Jessica Positano. *Id.* at 23.

### *C.K.'s IEP*

C.K. argues, generally, that his reading scores went up with more LMB tutoring, and went down with less. *See* Doc. 38, at 20-26. Therefore, he argues, the LMB tutoring he received in the past must continue, and the past costs must be reimbursed to remedy the District's failure to provide a free appropriate public education. *Id.*

On the one hand, the Supreme Court has made clear that C.K.'s IEP must be "reasonably calculated to enable a child to make progress appropriate *in light of the child's circumstances*." *Endrew F.*, 137 S. Ct. at 1001 (emphasis added). This standard is far beyond *de minimis* educational benefits. *Id.* at 1000. And the Court recognizes that, in certain circumstances, C.K. can read at, or even above, grade level. *See* Doc. 30, at 188. On the other hand, in the same case, the Supreme Court made clear the Act requires a reasonable plan, not an ideal one. *Endrew F.*, 137 S.

15

Ct. at 999. For the following reasons, the Court finds C.K. has not met his burden of showing the District failed to provide him a free appropriate public education.

First, the intensive LMB tutoring ignores and actively harms C.K.'s other stated IEP goals. While enrolled in the District, each of C.K.'s IEPs included additional goals independent from reading. *See* Doc. 30, at 139-146, 161-69, 190-200, 234-48; Doc. 42, at 5-14. C.K.'s goals in social communication and executive functioning, for example, are not advanced and are likely harmed by intensive LMB tutoring taking C.K. out of the classroom. *See* IHO Opinion, at 18, 22. C.K. repeatedly needed additional assistance in achieving his social communication goals, as shown in his December 2016 IEP (Doc. 42, at 9), his May 2017 IEP (Doc. 30, at 164), his November 2017 IEP (Doc. 30, at 195), and his September 2018 IEP (Doc. 30, at 241). Educational expertise is hardly required to find isolating C.K. for at least two hours per school day is counter-productive to C.K.'s social interaction skills. Further, while the District noted C.K.'s IEP did not have a math goal, S.R. believed he was falling behind in math, likely because C.K. did not attend math class. *See* Doc. 30, at 226.

S.R. wants to pick and choose precisely how C.K. should pursue each of the goals both she and the District identified, but the Act does not place the burden of meeting S.R.'s precise expectations on the District. *See id.*; *Rowley*, 458 U.S. at 207 ("The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child."). S.R. acknowledged these non-reading goals by signing off on annual IEPs. *See, e.g.*, Doc. 30, at 154 (December 2016 IEP), 208 (November 2017 IEP). She cannot also then dictate to the District that only C.K.'s reading goal receive attention at the expense of his other identified needs and goals.

16

This Court's findings are contrary to the SLRO's findings. She found LMB tutoring essential for C.K. to receive his free appropriate public education under the Act (and thus, the IEP inadequate), but her bizarre and concerning legal errors mean this Court cannot grant her conclusions any deference. The SLRO accused both the IHO and the District of ignoring the Supreme Court's most recent guidance. (SLRO Opinion, at 38). However, none of the language cited by the SLRO, which she accuses them of ignoring, actually comes from *Endrew F*. She purports to quote *Endrew F.*, writing "all children with disabilities are entitled to an 'appropriately ambitious' and 'challenging' educational program . . . that shields children from low expectations." *Id.* Beyond the three words internally quoted, the language actually comes from an amici curiae brief, filed in a Third Circuit case, *K.D. ex rel. Dunn v. Downingtown Area School District*, 904 F.3d 248, 251 (3d Cir. 2018). *See* Brief for Amici Curiae Council of Parent Attorneys and Advocates, Inc., Education Law Center, New Jersey Special Education Practitioners and National Center for Learning Disabilities in Support of Appellants and Reversal, *K.D.*, 904 F.3d 248, (No. 17-3065), 2018 WL 1215251, at 22-23. Similarly, the SLRO wrote that *Endrew F.* warned of "[g]eneral assumptions about a category of disability have no place in the analysis; IDEA's expectation of *grade-level advancement* and a child's *individual circumstances* are paramount [so that] every child has the chance to meet challenging objectives." (SLRO Opinion, at 38). But that command does not appear in *Endrew F.* Rather, it is a position advocated by the Council of Parent Attorneys and Advocates, Inc., Education Law Center, New Jersey Special Education Practitioners and National Center for Learning Disabilities in that same Third Circuit amicus brief. *See* 2018 WL 1215251, at *23. Whether the error occurred by an act of intentional bad faith or extreme incompetence, the effect is not a mere citation error. The SLRO's mistake places the words of an advocacy group in the mouth of the Supreme Court and then applies them to the facts of this case.

17

To the contrary, the IHO and the District both recognize what *Endrew F.* actually requires: an IEP reasonably calculated to enable a child to make appropriate progress in light of the child's circumstances. *See* Doc. 26-1, at 16; IHO Opinion, at 17, 21. It is the SLRO, as discussed above, who ignored binding precedent when she prescribed educational outcomes for C.K., among other errors. The language she cited is contrary to the Supreme Court's command in *Endrew F.*, which presumes grade level advancement only when a child is fully integrated in a regular classroom. 137 S. Ct. at 999. The SLRO, as discussed above, ordered intensive reading tutoring outside the regular classroom. Thus, her opinion is not due the deference it would typically receive.

Second, the heavy dose of LMB tutoring sought by C.K. (and ordered by the SLRO) violates the Act's least restrictive environment requirement. In her opinion, the SLRO misstates the Act's preference for mainstreaming disabled students, casting doubt on the reasonableness of her conclusions and remedies. The Act requires districts, to the maximum extent appropriate, to educate students with disabilities alongside children without disabilities. 20 U.S.C. § 1412(a)(5)(A) ("To the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."). Students can be segregated out of the regular classroom if the student would not benefit from regular education, any regular class benefits would be *far outweighed* by the benefits of special education, or the student would be disruptive in a regular class. *L.H.*, 900 F.3d at 789. In some cases, a placement better for academic purposes may not be appropriate for failing to provide mainstreaming. *Id.*

18

The SLRO's opinion, which found intensive LMB tutoring was C.K.'s least restrictive environment, gets this precisely backwards. She found, "[t]he mainstreaming preference to educate in the least restrictive environment must be secondary to the educational benefits of learning to read and write." (SLRO Opinion, at 61). Further, she describes the least restrictive environment as the program used, instead of the location of that placement. *Id.* at 85 ("That is, whether C.K.'s appropriate reading instruction was in the classroom, or inside the school building down the hall, or in another building down the street from the School, C.K.'s appropriate placement in the LRE is not defeated because the LRE is the educational program, not the location."). This is plainly at odds with the clear statutory mandate of the Act to educate students with disabilities alongside students without them. 20 U.S.C. § 1412(a)(5). Whatever the academic benefits conferred by LMB are, it is unquestionably a restrictive environment, with one-on-one tutoring separate from the classroom or any other students. Because the SLRO so grievously misstates the least restrictive environment standard, this Court cannot defer to her finding that intensive LMB tutoring satisfies that standard for C.K.

There is no record evidence C.K. is disruptive in the classroom and, as discussed above, further integration in the regular classroom benefits C.K.'s non-reading goals. *L.H.*, 900 F.3d at 789. Thus, only if C.K. shows LMB tutoring far outweighed fuller integration in the regular classroom could LMB tutoring be C.K.'s least restrictive environment. But the mixed reading results of LMB indicate the improved reading skills from LMB tutoring do not far outweigh the regular classroom benefits. In between third and fourth grades, a summer of intensive LMB tutoring resulted in no progress for C.K. (Tr. Vol. 1, at 62); (Tr. Vol. 3, at 132-33). During C.K.'s fourth-grade year, when he was not participating in intensive LMB tutoring, he still made reading progress. (Doc. 30, at 217-19). S.R. acknowledged the District's plans have allowed C.K. to

progress, but she wanted LMB tutoring, which she called the "gold standard". *Id.* at 226. Thus, C.K. has not shown LMB tutoring "far outweighs" the benefits toward the other goals C.K. could receive through fuller integration into the classroom. Thus, the least restrictive environment standard is not satisfied by LMB placement.

Third, the District's 2017-18 IEP offered LMB tutoring to C.K., but S.R. rejected the offer. S.R. rejected a proposal from the District that would have incorporated LMB tutoring into C.K.'s IEP, without the restrictive, isolating environment S.R. sought for him. This Court's analysis is primarily concerned with the future—whether the IEP reviewed by the IHO and SLRO is reasonably calculated for C.K. to make progress in light of his circumstances, not whether past IEPs did allow for progress. That is, the effectiveness of LMB tutoring during times C.K.'s IEP did not include LMB tutoring does not mean the IEP denied C.K. a free appropriate public education. *See T.J. v. Winton Woods City Sch. Dist.*, 2013 WL 1090465, at *12 (S.D. Ohio) (quoting *Schaffer ex rel. Schaffer v. Weast*, 554 F.3d 470, 477 (4th Cir. 2009)). But past results indicate LMB tutoring was effective for C.K., and that the District took steps to incorporate that evidence helps support this Court's finding that the *Endrew F.* standard is met.

A parent is only entitled to reimbursement when both the public placement violated the Act, and the private placement was appropriate under the Act. *Florence Cty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15 (1993). And, as discussed above, C.K. did not show the District failed to meet its substantive burden under the Act. Therefore, C.K. and S.R. are not entitled to reimbursement for past LMB tutoring sessions. Further, C.K. has not shown the 2017-18 IEP is not "reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Endrew F.*, 137 S. Ct. at 999. The District's decisions in that document are entitled to some deference, the IHO found this plan satisfied the Act's requirements, and this IEP

sought to include the LMB tutoring that seems effective for C.K. Therefore, this Court finds C.K. did not show the District committed any substantive violation of the Act. *Knable*, 238 F.3d at 768. ("The party challenging the terms of an IEP bears the burden of proving that it is inappropriate.").

Extended School Year

C.K. argues, because the District failed to provide a free appropriate public education during the school year, summer interventions were necessary to receive some educational benefit. (Doc. 38, at 31-33). The SLRO, in her reimbursement award, included the cost of past LMB summer tutoring. (SLRO Opinion, at 93). The District argues any regression C.K. experienced was not severe enough, or not regained quickly enough, to justify ESY services. (Doc. 28-1, at 21-23). For the following reasons, the Court finds C.K. is not entitled to reimbursement for past LMB summer interventions.

Both the SLRO and C.K. begin from the premise that C.K. has not received a free appropriate public education. *See* Doc. 38, at 32, SLRO Opinion, at 75-77. But, as discussed above, the Court finds to the contrary. Thus, C.K. must show "the benefits accrued to the child during the regular school year will be significantly jeopardized if he is not provided an [extended school year]." *Board of Educ. of Fayette Cty, Ky., v. L.M.*, 478 F.3d 307, 315 (6th Cir. 2007). "[P]roviding an [extended school year] is the exception, not the rule under the regulatory scheme." *Cordrey v. Euckert*, 917 F.2d 1460, 1473 (6th Cir. 1990). C.K. does not make an argument that he satisfies this standard. Indeed, there is some evidence LMB summer tutoring led to a regression in C.K.'s reading abilities, the only one of C.K.'s areas of need LMB could conceivably improve. (Tr. Vol. 1, at 62; Tr. Vol. 3, at 132-33). Thus, C.K. has not met his burden to show he is entitled to ESY services.

The SLRO, in her analysis of the District's obligation to provide an ESY, mischaracterized Fourth Circuit law to replace the binding Sixth Circuit cases cited by the IHO. (SLRO Opinion, at 69). She also cited a 2004 letter, addressing whether West Virginia schools could pursue a particular ESY plan without running afoul of Fourth Circuit law, to provide the standard for whether C.K. is entitled to ESY services. *Id.* at 69-70. School districts and courts do not generally need to consider "window of opportunity" evidence, as the SLRO argued, though the Fourth Circuit did order a hearing officer on remand to consider specific evidence in a specific case regarding a child's "window of opportunity". *See JH ex rel. JD v. Henrico Cty. Sch. Bd.*, 326 F.3d 560, 568–69 (4th Cir. 2003). Further, an advice letter from the Department of Education to a West Virginia attorney in 2004 is never going to bind this Court, even if the letter was responsive to a relevant question, which it is not. The letter cited by the SLRO answers what factors West Virginia schools may consider when determining ESY eligibility. (Office of Special Education and Rehabilitative Services, Letter to Given, 1-2 (2003), https://www2.ed.gov/policy/speced/guid/idea/letters/2003-1/given020403iep1q2003.pdf). "But a claimant seeking an ESY must satisfy an even stricter test" than what schools are held to, because ESY services are an exception, not the rule. *Cordrey*, 917 F.2d at 1473. Thus, because the SLRO's opinion rests on inaccurate and inapplicable legal standards, her opinion regarding ESY services is not due any deference and can be set aside by this Court. Because this Court finds C.K. did not show the District failed to provide a free appropriate public education, nor did he show the sought-after ESY services were necessary to preserve past progress, his claim for reimbursement for past ESY services must fail.

Retaliation

The SLRO found the District retaliated against C.K. for filing a due process complaint by marking time spent with LMB tutors as unexcused absences. (SLRO Opinion, at 79-87). As remedy, she ordered the District to change the absences to excused. *Id.* at 86-87. This issue was unaddressed in the District's initial brief, and only as a brief footnote in C.K.'s brief. In the District's reply brief, it asserts, in its complaint, that it retained the right to address issues not raised in its initial brief in the reply brief. The District's complaint, in two places, purports to reserve its right to attack conclusions reached by the SLRO but not addressed in the complaint. *See Bd. of Educ. of Sylvania City Sch. Dist. v. C.K.*, No. 20-cv-81 (N.D. Ohio) (Doc. 1, at 7 n.3, 12). It does not raise any argument or allegation concerning attendance in its complaint. While the District argues the SLRO's opinion lacks the requisite clarity to identify each issue it wished to challenge, *id.*, the SLRO opinion, in a bold heading, announces to any reader that she considered whether marking C.K.'s absences as unexcused was retaliatory. (SLRO Opinion, at 79).

Issues raised before a district court and then not raised on appeal are considered abandoned. *Enertech Elec., Inc. v. Mahoning Cty. Comm'rs*, 85 F.3d 257, 259 (6th Cir. 1996). Similarly, a claim raised at an administrative hearing and then not raised before the court can also be deemed abandoned. *See, e.g.*, *Miles v. Comm'r of Soc. Sec.*, 2008 WL 4387083, at *7 (E.D. Mich.). Further, the parties had until May 30, 2020 to amend their pleadings. (Doc. 13). No amendment to raise the issue of attendance and retaliation was made. And a response to a motion for summary judgment, like the reply brief filed by the District, cannot amend pleadings. *Tucker v. Union of Needletrades, Indus. & Textile Emp.*, 407 F.3d 784, 788 (6th Cir. 2005). Thus, the District's complaint does not raise any objection to the SLRO's handling of the attendance and retaliation issue and this issue is not properly before the Court.

Additionally, even if the District's language in the complaint preserved a right to attack the SLRO's conclusion on this issue in its merit briefing, raising that attack for the first time in a reply brief is improper. *Toth v. Ford Motor Co*., 2008 WL 11380224, at *1 (N.D. Ohio) (citing multiple Sixth Circuit cases that "give discretion to the district court to decline to address arguments advanced for the first time in a reply brief.").

The Court therefore exercises its discretion and finds the District waived its opportunity to challenge the SLRO's findings as to retaliation and attendance. C.K., by virtue of the District's failure to brief the issue at the first opportunity, had no opportunity to respond to the District's reply-brief arguments. While the SLRO's opinion is lengthy, and no model of clarity, this issue received its own bolded subheading, and included a direct order that the District amend C.K.'s attendance record from unexcused absences to excused. (SLRO Opinion, at 86-87). The District's attempt to reserve the right to raise any argument, at any time, concerning the SLRO's opinion fails, for the District needed to have that right in order to reserve it. The District could have amended its complaint, but did not. It could have raised the argument in its initial brief, but did not. Therefore, the issue is waived, and the SLRO's order to amend C.K.'s attendance record stands.

CONCLUSION

For the foregoing reasons, good cause appearing, it is hereby

ORDERED that the District's Motion for Summary Judgment (Doc. 26) be, and the same hereby is, GRANTED; and it is

FURTHER ORDERED that C.K.'s Motion for Summary Judgment (Doc. 38) be, and the same hereby is, DENIED; thus it is

FURTHER ORDERED C.K.'s claim for reimbursement for past expenses is DENIED, and it is

FURTHER ORDERED that the District amend C.K.'s attendance record in compliance with the SLRO's Order.


 s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE